## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| EDWARD C. HUGLER,[1] ACTING SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR,<br><br>　　　PLAINTIFF,<br>v.<br><br>FORECLOSURE CONNECTION, INC. and JASON WILLIAMS,<br><br>　　　DEFENDANTS. | **FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>Civil Action No. 2:15-cv-00653-DAK<br><br>District Judge Dale A. Kimball |

On September 11, 2015, Plaintiff filed a Complaint against Defendants Foreclosure Connection, Inc. and Jason Williams, alleging that Defendants violated Sections 11(a) and 15(3)(a) Fair Labor Standards Act ("FLSA" or "Act"). Doc 2. Specifically, Plaintiff alleges that Defendants interfered with the U.S. Department of Labor, Wage and Hour Division ("WHD") investigation of Defendants' pay practices by failing to provide documents, providing false documents, and intimidating employee witnesses from participating in Plaintiff's investigation. Plaintiff also alleges that Defendants retaliated against two employees, Mychal Barber and Mychal Scott Barber (a father and son), by firing the Barbers after they made a complaint to WHD about Defendants' failure to pay overtime premiums.

Defendants allege that all of their workers, including Mychal Barber and Mychal Scott Barber, are independent contractors not subject to the FLSA, its overtime requirements, or the

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Edward C. Hugler, Acting Secretary of Labor, is automatically substituted as the party in interest for the former Secretary of Labor, Thomas E. Perez.

anti-retaliation provision in Section 15(a)(3). Defendants admit that they impeded the WHD investigation, in violation of Section 11(a), but deny that such violation is continuing. Plaintiff alleges that Defendants' efforts to interfere with WHD's pending overtime investigation are ongoing and that Defendants are in contempt of the Court's September 22, 2015 Preliminary Injunction, which enjoins Defendants from retaliating against employees from cooperating in the WHD investigation, creating false documents, or terminating employees without advance written notice to WHD.

The Court held a bench trial on January 9 – 17, 2017. Plaintiff was represented by Courtney Przybylski, attorney for the U.S. Department of Labor. Defendants were represented by David E. Ross II. The Court heard the testimony of witnesses, received into evidence exhibits and joint stipulations by the parties, and has considered the parties' written arguments. After considering all the evidence, the Court finds that Plaintiff has met its burden and demonstrated that Defendants violated Section 11(a) and 15(a)(3) of the FLSA.

## FINDINGS OF FACT[2, 3]

1.      Plaintiff Secretary of Labor ("Secretary") represents the U.S. Department of Labor and the Wage and Hour Division ("WHD"). WHD is the agency responsible for

---

[2] The Court enters these findings of fact based on a preponderance of the evidence. In assessing the credibility of the witnesses, the Court has considered the source and basis of each witness's knowledge; the ability of each witness to observe; the strength of each witness's memory; each witness's interest, if any, in the outcome of the litigation; the relationship of each witness to either side in the case; and the extent to which each witness's testimony is either supported or contradicted by other evidence presented at trial.

[3] References to the uncontroverted facts submitted by the parties and adopted by the Court in its December 20, 2016 Pretrial Order (Doc. 40) are abbreviated as "Stip. Fact [X]." References to the hearing transcript are abbreviated as "Tr. at [page:lines]." References to the Plaintiff's exhibits admitted at trial are abbreviated as P. Ex. [X]. References to the Defendants' exhibits admitted at trial are abbreviated as "D. Ex A[X]," in accordance with Defendants' exhibit markers.

enforcement of the FLSA, which governs minimum wage, overtime, and other protections for employees. *See* Tr. at 27:20-28:2; 32:8-18. Plaintiff began an investigation of Defendants on July 8, 2015, following a complaint on July 7, 2015 from Mychal Barber ("Barber Sr.") and his son, Mychal Scott Barber ("Barber Jr."), about Defendants' failure to pay overtime premiums. Tr. at 34:11-19; 123:21-124:4. Wage Hour Investigator Sheffield Keith ("WHI Keith") took the initial complaints and was assigned to handle the investigation. Tr. at 33:21-34:19; 36:19-37:5.

2.      Defendant Foreclosure Connection, Inc. ("FCI") is a Utah corporation in the business of acquiring properties in or near foreclosure status and renovating these properties for rental or resale as a return on investment. Stip. Fact 1; Tr. at 1062:21-1063:18. This business is known as "flipping houses." Tr. at 96:11-14; 1022:1-11. The renovation work performed for this business depends on the needs of the acquired property and may consist of anything from minor repair work to general construction. Stip. Fact 2.

3.      FCI offices are located at 2226 West 5400 South, Taylorsville, Utah 84129. Stip. Fact 6. FCI worksites are the properties under renovation, and each worksite is identified by the address of the property. Stip. Fact 3.

4.      Defendant Jason Williams ("Williams") is the manager of FCI. He and his business partners own a number of related business entities, including but not limited to: FCI; MedPro, LC; Equity Savers, LLC; BPO Specialists, LLC, Castlerock Unlimited, LLC; Sun Equity, LLC; TriForce Group, LLC; Williams & Clark, LLC; Williams & Reynolds, LLC; Brothers Enterprise, LLC; October Way, LC; Cadyn, LC; Wilshire Place, LLC, and Godnick Investment, LC. Stip. Fact 4. Through these business entities, Williams and his business partners own the properties renovated and managed by FCI. Stip. Fact 5; Tr. at 648:4-18; 1017:21-22; 1023:13-19; 1024:5-11; 1026:18-1027:11.

5.      FCI and its related business entities are a single enterprise. They share a common business purpose and common control under the umbrella of FCI. Tr. at 70:22-71:11; 201:23-202:5; 645:3-648:15. Each entity is in the business of flipping houses. Tr. at 648:16-18. FCI maintains a common workforce, office, and operations management for these entities. Although each entity has separate bookkeeping and bank accounts, FCI centrally manages them all, tracking all labor and material costs and making payments for and between these entities. Tr. at 648:8-18; 649:2-16. Williams has an ownership stake and management responsibilities for each entity, including assigning work and determining the scope of projects needed for each property. Stip. Fact 4; Tr. at 118:10-23; 908:23-909:3.

6.      As the manager of FCI, Williams is responsible for hiring and firing the workers on Defendants' properties and the properties of their related business entities. Tr. at 909:4-14. He gives the orders for workers to report to a property and to perform the work that he wants done. Tr. at 908:23-909:3. He sets the hourly rate of pay for each worker, and this rate is not negotiable. Tr. at 118:1-3; 217:21-24; 251:21-252:3; 258:1-259:9; 291:22-23; 294:9-11; 368:14-21; 400:2-19. Williams also makes decisions about which properties to buy, which to renovate and to what extent, and which properties to rent or sell. Tr. at 118:10-23.

7.      David Garcia ("Garcia") is the operations manager of FCI and one of its owners. Tr. at 645:14-15. He handles day-to-day business operations and manages contracts, bookkeeping and accounts payable/receivable, payroll, tenant maintenance issues, and lease agreements. Tr. at 589:20-590:8. He also coordinates with Williams and the other business partners about their ongoing renovation projects. Tr. at 589:24-25. He had primary responsibility for gathering the documents responsive to Plaintiff's requests in this matter. *See*, *e.g.*, Tr. at 612:14-20 (referencing P. Ex. 17); Tr. at 616:2-21 (referencing P. Ex. 6): Tr. 624:6-625:10

(referencing D. Ex. A25); Tr. at 660:22-25 (referencing P. Ex. 18). Because Garcia is authorized to make business decisions, enter contracts, and sign paychecks on behalf of FCI, he is an agent of Defendants.

8.      Jack Erickson ("Erickson") is a working foreman for Defendants and, as such, acts as their agent. He performs many of the same jobs as other construction workers on Defendants' jobsites. *See* Tr. at 871:8-818:7; P. Ex. 27. However, Erickson assigns work to the other construction workers on a daily basis, following Williams' instructions. Tr. at 911:14-912:12; P. Ex. 27. Erickson is responsible for making sure that the work is done on time and is acceptable to Defendants' standards. Tr. at 221:7-12; 912:13-19. He gives verbal warnings and reports problems to Williams, so that Williams can address them with the workers. Tr. at 912:20-913:16.

**Employment Relationship**

9.      As part of their business, Defendants hire construction workers. Tr. at 96:15-18. A number of these workers, including but not limited to Erickson, Barber Sr., Barber Jr., and Exequiel Magana ("Magana"), are Defendants' current or former employees. Tr. at 82:9-83:11. These employees, whom Defendants suffered or permitted to work, were economically dependent on Defendants and were not engaged in business for themselves. *See* Tr. at 95:2-8; 99:16-100:8; 513:12-514:18.

10.     These construction workers performed renovation work on Defendants' properties. Tr. at 96:15-18. This renovation work was necessary to make the properties profitable and, as a result, was integral to Defendants' business. Tr. at 95:21-96:10; *see also* Tr. at 1064:16-21.

11.     Only two of Defendants' construction workers, Erickson and Barber Sr., were licensed by the Utah Department of Occupational and Professional Licensing ("DOPL") to perform construction work as general contractors. Tr. at 358:10-18; 877:17-22. Other workers, including Magana, Barber Jr., Antonio Villa ("Villa") and Brandon Gilleland ("Gilleland") performed the same work but were unlicensed. *See* Tr. at 285:18-286:2; 403:17-18; 557:10-15; 579:25-580:12. At all times relevant to this proceeding, Defendants were not licensed by DOPL to perform construction work. Stip. Facts 32 and 33.

12.     Whether Defendants sold a property at a profit and the amount of profit made had no effect on the earnings of Defendants' construction workers, who were paid an hourly rate for all work performed. Tr. at 98:20-100:4. This hourly rate was the same for all hours worked, although Defendants paid their construction workers different rates. *See* Tr. at 100:5-8; 225:17-21; 299:24-300:1; 388:18-20; 882:12-14. At all times relevant to this proceeding, Erickson made $25 per hour, Barber Sr. made $25 per hour, and Barber Jr. made $11 per hour. Tr. at 291:19-21; 388:14-17; 885:16-886:7; 1053:13; 1088:23; 1120:13-20. Magana made $13 per hour but for about a year received an additional $5 per hour for hours over 40 in a week. Tr. at 216:18-22; 217:14-20. He also received a raise to $20 per hour in June 2016. Tr. at 216:18-20; 1085:14-25.

13.     Defendants hired these construction workers for an indefinite term. Barber Sr., Barber Jr., Erickson, and Magana were hired not to work for a specific project, property, or time period, but to work full time on a continuing basis. Tr. at 101:12-25; 130:11-122; P. Ex. 6 (subcontractor agreements). Defendants regularly had sufficient work available for each of them to work more than 40 hours per week. Tr. at 11-13; 213:10-20; 299:24-300:1; 370:14-22; 882:15-24. Some construction workers, including Erickson and Magana, worked for Defendants for more than five years. Tr. at 209:1-2; 822:12-18. While these workers occasionally picked up side

jobs, they did so with Williams' permission. Tr. at 222:3-19; 865:15-866:8; 886:17-21. Other workers, such as Barber Sr. and Barber Jr., worked exclusively for Defendants. Tr. at 298:7-12; 401:8-19. Garcia admitted that he considered Erickson, Magana, and Barber Sr. to be permanent workers. Tr. at 782:1-5.

14. As licensed general contractors, Barber Sr. and Erickson demonstrated more skill in construction work than Defendants' other hourly workers. Tr. at 104:25-105:11. However, none of Defendants' hourly workers was required to demonstrate any particular business skill, judgment, or initiative. Tr. at 104:16-24. Although the subcontractor agreements that Defendants produced indicated that each worker would "bid each job at an hourly estimation," Barber Sr., Barber Jr., and Magana testified that they never put together estimates of labor and material costs to bid jobs for Defendants. P. Ex. 6; Tr. at 218:19-25; 306:2-20; 394:15-23. Although Erickson testified that he occasionally submitted bids to Defendants for particular jobs, he usually worked for Defendants on an hourly basis and was not responsible for material costs. Tr. at 892:24-893:18.

15. Defendants' construction workers mostly used their own hand tools, which is common in the construction industry. Tr. at 111:3-15; 264:2-12; 381:19-22. However, Defendants also purchased or rented some large tools, such as a concrete saw and a landscaping machine, for their workers to use. Tr. at 211:22-212:15; 381:23-382:12. For example, Williams admitted that he purchased a Makita concrete saw because the workers could not justify the cost of buying the saw for their own use, and Williams "got tired of renting them" for his projects. Tr. at 1061:15-21. Both Barber Sr. and Magana testified that Williams provided the concrete saw for the workers to use on Defendants' properties. *See* Tr. at 211:22-212:3; 381:24-382:3.

16.     As part of his investigation, to determine the existence of FLSA enterprise coverage, WHI Keith learned that Defendants' construction workers used a Makita concrete saw. He researched Makita and determined that the company manufactured its products outside of Utah. Tr. at 141:16-21. Makita Corporation of America (MCA) is located in Buford, Georgia, and is part of the Makita global network of ten manufacturing and assembly plants. *See* https://www.makitatools.com/company/about-us.

17.     Defendants or their related business entities pay for all the materials used on their worksites. Stip. Fact 36. Defendants' construction workers may acquire materials, but FCI must approve the purchases, which are made on FCI's commercial accounts. *See id.*; Tr. at 459:3-10. The vast majority of these materials, including lumber, are purchased from a national retailer, The Home Depot. Tr. at 112:9-16; 212:21-25; 295:15-296:2; 392:2-14; 604-5-22; 1001:11-14. The Home Depot primarily sources its wood throughout North America, although it also sources wood from five other continents. *See* http://ecooptions.homedepot.com/sustainable-forestry/.

18.     Defendants exercised control over their construction workers. Williams, as the manager of FCI, was ultimately responsible for the work done on behalf of FCI and its related business entities. Tr. at 114:14-16. On a daily basis, he determined which workers to have on the job site, which job site they should work on, what type of work they should do, and the time they should spend on the job. Tr. at 114:16-21; 337:7-14; 908:23-909:3. Typically, Williams gave instructions to the construction workers through Erickson, who also was working on the jobsites and oversaw the work performed. Tr. at 115:6-17; 337:15-25; 384:2-8; 912:4-19. Erickson reports directly to Williams and receives his orders from Williams. Tr. at 908:14-22; P. Ex. 27.

19.     Erickson's own statements contradict his claims that he did not supervise the Barbers and that they worked independently. Tr. at 817:8-818:3; 823:20-824:15. *Compare* Tr. at 818:8-11 (Erickson never told Barber Sr. that he needed to do something different or speed up his work

because Erickson "was happy with what he was doing") *with* Tr. at 811:11-21 (Erickson inspected Barber Sr.'s work and found "a lot of it that was poor … and it kind hurt me a little bit because I am the one who taught him so it reflected on me."). Additionally, Magana, Barber Sr., and Barber Jr. each testified that Erickson was their supervisor. *See* Tr. at 221:7-12 (Magana, stating that Erickson was the supervisor for everyone he worked with); Tr. at 281:3-10 (Barber Jr., stating that Erickson was the foreman and "usually relayed orders for us to do, told us what to do and how to complete it..."); Tr. at 396:2-18 (Barber Sr., stating that Erickson checked the quality and timeliness of his work, although no one, including Erickson, ever communicated having problems with his work).

20. Although the construction workers had some flexibility in their schedule, they tended to work from 7:00 a.m. or 8:00 a.m. to 5:00 p.m. or 6:00 p.m., Monday through Friday. *See* Tr. at 114:22-115:8; 116:10-21; 213:5-16; 274:17-2; 289:2-11; 383:20-25; 384:14-25. *See also* P. Ex. 7, 8, 10, 27.

21. At trial, Williams' own explanation of the structure of this work arrangement indicated an employment relationship. *See* Tr. at 1070:3-6 ("For me, I eliminated all of that, overruns and shortages through my company. And for that I said, I will give you an hourly contracted rate that eliminates all your risk. And you can work for me as long as you want…."); 1108:3-9 ("… I looked at it as in he needed someone like me that could have a win-win relationship to where he could get paid a contracted hourly price…, [and] there was a way for me to control the over all cost of the job…."); 1108:19-23 (Barber Sr. "was able to go to the job and all of the materials were provided which gave him the ability to … do what he needed to do and not have to sweat … how long is it going to take me to recoup back all of the money I just spent on materials.").

**Enterprise Coverage**

22.     On April 25, 2016, Defendants filed a Motion for Summary Judgment ("Motion"), arguing that Plaintiff failed to establish that Defendants' employees were engaged in interstate commerce and subject to individual coverage under the FLSA or were employed by an enterprise engaged in interstate commerce and subject to enterprise coverage under the FLSA. *See* Motion at p. 5. More specifically, Defendants argued that they were engaged only in intrastate commerce that their workers did not "handle" goods in commerce within the meaning of 29 U.S.C. § 203(s)(1) and the first prong of the enterprise coverage test. *See* Motion at p. 5. Defendants failed to argue the second prong of the test – whether they were an enterprise whose annual gross volume of sales made or business done ("annual dollar volume" or "ADV") was less than $500,000. *See* Motion at p. 6-7.

23.     On May 23, 2016, Plaintiff filed a Response to Motion for Summary Judgment ("Response"), which challenged as a matter of law the application of coverage to the Section 11(a) and Section 15(a)(3) violations alleged in its Complaint. Plaintiff also raised a genuine dispute of material fact as to whether Defendants' workers "handled" goods in commerce within the meaning of 29 U.S.C. § 203(s)(1). Plaintiff conceded that, even if required, individual coverage did not apply in this case. Response at p. 10.

24.     On August 19, 2016, the Court issued a Memorandum Decision and Order ("Decision") holding that Sections 11(a) and 15(a)(3) of the FLSA do not have the same "commerce" requirements as other sections of the Act, and Plaintiff was not required to establish individual or enterprise coverage to support its claims. Decision at p. 3-4.

25.     On August 26, 2016, Defendants filed a Motion for Reconsideration, captioned as a Motion for Judgment as a Matter of Law ("Reconsideration Motion"), asking the Court to

reverse its Decision on the basis that Plaintiff had not alleged sufficient facts to show Defendants' workers handled goods moved in or produced for commerce, because: 1) Plaintiff failed to show these goods were made out of state; and 2) Defendants were the ultimate consumers of these goods, removing them from commerce. Reconsideration Motion at p. 5-6.

26.     On October 31, 2016, the Court issued a Memorandum Decision and Order denying Defendants' Reconsideration Motion ("Reconsideration Decision"). In its Reconsideration Decision, the Court held that Defendants' Reconsideration Motion only raised arguments that Defendants previously made or should have made, which the Court addressed and rejected. *Id.* at p. 3. The Court found that Defendants failed to present new evidence or law "that convinces the court that its prior ruling should be revisited or was clearly erroneous…, [and] there is no basis for reconsidering or altering its prior ruling." *Id.*, citing *Major v. Benton*, 647 F.2d 110, 112 (10th Cir. 1981).

27.     At the bench trial of this matter on January 9, 2017, Defendants made an untimely oral motion to dismiss on the basis that Plaintiff failed to establish the second prong of enterprise coverage, arguing that Defendants' annual dollar volume did not exceed $500,000 annually during the WHD investigation period, from July 2013 to July 2015. Tr. at 5:3-17; 7:10-16; 10:24-11:6. The Court provisionally denied Defendants' oral motion but indicated it would allow testimony on the subject as a jurisdictional matter. Tr. at 10:24-11:6.

28.     The Secretary presented evidence of the sale of investment properties by FCI and its related business entities that totaled more than $500,000 annually. WHI Keith reviewed the tax filings for years 2012, 2013, and 2014 to establish coverage for years 2013, 2014, and 2015, as Defendants operated on a calendar year basis. Tr. at 199:2-5; 200:23-25; 201:7-15. His review indicated that in 2013 and 2014, FCI alone had sales of real property in excess of $500,000. P.

Ex. 25; Tr. at 51:17-52:12; 150:20-151:18; 198:9-199:5; 200:1-25. In 2012, FCI and BPO Specialists had combined sales of real property in excess of $500,000. P. Ex. 25; Tr. at 51:17-52:12; 150:20-151:18; 202:14-25; 203:3-17.

29.     Defendants claim that some combination of gross profit, gross income, gross revenue, and/or cash receipts from the sale of these properties define the scope of annual dollar volume, and they introduced selected portions of their tax returns and other financial documents in support of this assertion. *See* Tr. at 150:4-11; 150:4-19; 153:18-154:8; 155:4-24. Even to the extent that these terms and their application to Defendants' exhibits may comport with generally accepted accounting principles, Defendants failed to call as a witness Ted Schumm, the certified public accountant who prepared those filings. Instead, Defendants attempted to elicit such testimony from Williams, who lacked sufficient knowledge, expertise, or experience to testify credibly about such matters. *See*, *e.g.*, Tr. at 152:15-153:3; 1027:12-24; 1028:10-20; 1030:9-1031:9; 1032:16-1034:21; 1036:5-15.

**Intimidation/Interference**

30.     On July 15, 2015, Williams met with workers Erickson, Magana, Villa, and two other construction workers, Gary Troy Denter and Justin Malin, at the Marsha Brook worksite. Stip. Fact 17. Garcia also was present. Tr. at 225:22-226:5. During this meeting, Williams made a number of statements intended to coerce, intimidate, or frighten the employees from talking to or providing truthful information to WHD investigators. Tr. at 133:7-135:17; 510:12-511:19; P. Ex. 11. These statements included: information that the Barbers had turned Williams in to WHD and that they no longer worked for him; implied threats of job loss and income tax audits; notice that Defendants would no longer keep or provide pay records; and instructions not to provide pay records to WHD, to avoid questions from WHD investigators, and to provide false information

and documents to WHD that were intended to conceal the employment relationship between Williams and the workers. *See id.*; Table 1 in Appendix.

31.     Williams' statements from the July 15, 2015 meeting, and his inferred intent from those statements, are accepted as true. *See* Tr. at 510:12-511:19. There are two reasons for this finding: First, the source of the recording is a credible witness without a financial stake in this litigation. Magana testified that he secretly recorded the meeting because he was concerned about Williams' earlier statement to WHI Keith that Williams had no Mexican workers like himself. Tr. at 226:18-227:7. Although Magana did not understand many of the statements made during the meeting, he understood that Williams' purpose was to tell the workers that he would not change the way he ran his business because of the WHD investigation. *See* Tr. at 230:12-16; 234:7-19. Second, Williams admitted that he made the statements on the recording, and Defendants stipulated that Williams' actions during the July 15, 2015, meeting impeded the WHD investigation. Tr. at 1099:17-23; Stip. Fact 21.

32.     In addition to the July 15, 2015, meeting, Defendants took other actions that interfered with the WHD investigation:

    a.     Defendants repeatedly denied having payroll records and failed to provide payroll records throughout the course of this matter, including in response to WHD's initial requests for documents, a subpoena *duces tecum*, and requests for production of documents pursuant to Fed. R. Civ. P. 34. *See* Tr. at 48:25-15 (referencing P. Ex. 2); 55:9-22 (referencing P. Ex. 3); 59:17-60:7 (referencing P. Ex. 4); Tr. at 483:919 (referencing P. Ex. 17); Stip. Fact 14, 15, 24, 25. Payroll records provided by Barber Sr., Barber Jr., and Magana, as well as Williams' recorded statement that FCI would not keep payroll records

after the July 15, 2015 meeting contradict these denials. P. Ex. 7, 8, 10, 11-002 at 32:8-33:5.

b. At trial, Defendants introduced into evidence other pay and time records requested by WHD that were untimely produced. *See* D. Ex. A11-18 and A74-78, produced three days before hearing; D. Ex. A89, produced on fifth day of hearing. *See also* Tr. at 6:1-7; 772:1-20. On cross-examination, Garcia admitted that he was responsible for gathering the requested records and that D. Ex. A77-78 (and their source document, D. Ex. A89) were responsive to WHD's earlier requests. Tr. at 658:11-659:3. Although Defendants previously denied having the ability to reconstruct time records, Garcia admitted that he reconstructed the records in D. Ex. A11-18 in December 2016. Tr. at 496:20-24 (referencing P. Ex. 18 at ¶13); 497:18-25; 609:16-24.

c. Defendants provided IRS 1099 Forms for seven (7) workers, which were offered to show an independent contractor relationship between Defendants and their workers. P. Ex. 4, 6, 19. Although Defendants claimed to have this arrangement with and to provide a 1099 for each of their workers, the 1099s provided for seven (7) workers were far short of the 64 workers that Defendants identified during the course of WHD's investigation. P. Ex. 4, 22, 23; Tr. at 501:25-502:9. Further, some of the 1099s that Defendants provided showed different amounts paid to the same worker, from the same company, for the same year. Assistant District Director Milton ("ADD Milton") testified that because 1099s, if accurately reported to the IRS, are supposed to represent the total compensation paid to an individual for that fiscal year, multiple submissions with varying amounts suggested that the 1099s had been falsified. Tr. at 501:19-24. ADD Milton also testified that Williams' recorded statements from the July 15, 2015 meeting about the

need to match up his workers' reported tax information to his own tax records suggested that Defendants later fabricated the 1099s they provided to WHD. Tr. at 503:20-504:4. Both Magana and Erickson testified that they never received any 1099s from Defendants, although Defendants provided WHD with multiple 1099s for each of them. Tr. at 273:13-16; 874:1-6; P. Ex. at 6, 17, 19, 23. Garcia also admitted that Defendants' 1099s for 2013 and 2014 were not given to employees or reported to the IRS at the time, but were provided at either the end of 2015 or the beginning of 2016. Tr. at 793:23-794:5.

d.      Defendants provided subcontractor agreements for eight (8) workers that purported to show an independent contractor relationship between Defendants and their workers. P. Ex. 6, 19. Although Defendants claimed to have this arrangement and corresponding written agreements with all of their workers, the eight (8) agreements provided were far short of the 64 workers that Defendants identified during the course of WHD's investigation. P. Ex. 4, 22; Tr. at 498:25-499:12. ADD Milton testified that Williams' recorded statements from the July 15, 2015 meeting about the need to enter these subcontractor agreements and leave them undated suggested the agreements were falsified. Tr. at 502:16-503:14; 504:9-15. That WHD received the recording of this meeting prior to receiving any subcontractor agreements, which WHD previously had requested, also bolstered ADD Milton's determination. P. Ex. 1; Tr. at 126:20-127:3.

e.      At least two (2) of the subcontractor agreements that Defendants provided were not signed by the purported parties: Barber Sr. and Magana. Tr. at 239:12-240:1; 402:21-22; P. Ex. 6, 12. Defendants called only one witness, Erickson, who claimed to have signed a subcontractor agreement. Tr. at 891:22-892:6. Erickson testified that he could not recall when he signed the agreement, and his testimony was consistent with the

instructions Williams gave at the July 15, 2015 meeting, for which Erickson was present. *See id.*; Tr. at 897:11-24; P. Ex. 6, 11-004 at 7:8-22.

      f.      In June 2016, Defendants increased Magana's hourly wage rate from $13 to $20. Tr. at 216:18-25 (referencing P. Ex. 10); Tr. at 244:1-12 (referencing P. Ex. 12, 15); Tr. at 635:3-7. As a condition of the increase, Defendants insisted that Magana sign a new subcontractor agreement. Tr. at 639:15-640:9; 1088:1-1090:18; P. Ex. 15. This agreement was identical to the subcontractor agreement purportedly signed by Magana and provided to WHD in August 2015, except for the date of the agreement and the hourly rate of $20. Tr. at 244:1-12 (referencing P. Ex. 12, 15). Defendants imposed this condition despite the provision in the Court's September 22, 2015 Preliminary Injunction that "Defendants are enjoined from creating falsified documents, including but not limited to independent contractor agreements and 1099 Forms." P. Ex. 20 at ¶5.[4] Magana worked for at least six weeks at the higher wage rate without signing the agreement. Tr. at 1086:24-1087:9. During a meeting in September 2016, Magana told Williams that he would not sign the subcontractor agreement, and Williams replied that there would be no more work for him. Tr. at 242:20-243:18; 261:7-15; P. Ex. 15. As a result, Magana was fired or constructively discharged. *Id.* Defendants did not report Magana's termination to WHD at any time. *See* Tr. at 704:14-19; 724:2-5; 1084:14-19.

33.      Magana's refusal to sign the subcontractor agreement was a refusal to mispresent the nature of his working relationship to Defendants. Because Defendants terminated Magana for this refusal, Defendants violated multiple provisions of the Court's September 22, 2015 Preliminary Injunction. P. Ex. 20, ¶ 1 (enjoining Defendants from retaliating against current and

---

[4] Defendants do not admit that the subcontractor agreements they provided to WHD are false documents. However, during the cross-examination of ADD Milton, counsel for Defendants "conceded" that these agreements "were inappropriate." Tr. at 542:21-23.

former employees or workers for cooperating in the WHD investigation); ¶ 2 (enjoining Defendants from telling employees or works to provide false information to WHD regarding their conditions of employment); ¶ 5 (enjoining Defendants from creating falsified documents, including but not limited to independent contractor agreements and 1099 Forms); ¶ 8 (requiring Defendants to notify WHD, in writing, at least ten days prior to terminating any employee or worker for any reason).

**Retaliation against Barbers**

34.     In 2015, Barber Sr. and Barber Jr. performed renovation work on behalf of FCI. Barber Sr. began working for FCI on or about May 7, 2015. Barber Jr. began working for FCI on or about June 4, 2015. Stip. Fact 7. Both Barber Sr. and Barber Jr. received paychecks from FCI and its related business entities. Stip. Fact 8.

35.     On the morning of July 7, 2015, Barber Sr. and Barber Jr. went to work at Defendants' property located at 344 E. Lambourne. Tr. at 253:24-254:11; D. Ex. A77, 78. Magana, Villa, and another construction worker, Victor Corona, were also present at the worksite. *Id.*; D. Ex. A15, 16. Sometime that morning, Barber Jr. told Magana that he and his father were leaving to get materials from Home Depot and to take a lunch. Tr. at 253:24-254:8; 301:1-4; *see also* Tr. at 889:8-25 (Erickson testified that he worked at the Lambourne property on July 7, 2015 with Magana; Erickson and Magana discussed where Barber Sr. had gone, because Barber Sr.'s trailer was on site). Afterward, the Barbers went to the WHD office in Salt Lake City, Utah, to file a complaint against Defendants. Stip. Fact 10. In their complaints, Barber Sr. and Barber Jr. alleged that Defendants failed to pay overtime wages as required by the Fair Labor Standards Act ("FLSA"). *Id.*

36.     On the morning of July 8, 2015, Erickson called Barber Sr. and told the Barbers not to show up for work at FCI because there was not enough work for the Barbers to do. Stip. Fact 11. Later on July 8, 2015, WHI Keith held an FLSA investigation initial conference with Williams at the FCI office. Stip. Fact 13.

37.     One week later, Williams told Erickson that they should never hire the Barbers again because Barber Sr. was likely the person who turned Williams in to WHD. Tr. at 906:17-21; P. Ex. 27. Erickson testified that he fired Barber Sr. because Williams told Erickson that he wanted Barber Sr. "gone, cut loose." Tr. at 910:21-911:1. Sometime after this conversation, Erickson had another phone conversation with Barber Sr., in which Erickson reiterated that Williams directed him to "fire" the Barbers. Tr. at 915:19-25; P. Ex. 9-002. Barber Sr. recorded this conversation without Erickson's knowledge. *See* Tr. at 453:2-5. When confronted with the recording at trial, Erickson, claimed that he made this statement to "appease" Barber Sr. Tr. at 915:13-17. However, Erickson also told WHI Keith during an interview on August 4, 2015 that the Barbers were "fired," which undercuts this assertion. *See* Tr. at 916:5-19 (referencing P. Ex. 27).

38.     FCI did not pay the Barbers for the last 20 hours that they each reported working during the week ending July 9, 2015. Stip. Fact 9. WHD computed back wages for these hours based on Barber Sr. and Barber Jr.'s interview statements, as Defendants failed to provide any records of employees' hours worked. Tr. 527:23-528:4; 528:9-13; P. Ex. 21. At trial, Defendants untimely produced records purporting to show these hours but denied that the Barbers actually worked them. Defendants based this denial in part on the Barbers' inability to recall the specific times and locations reflected in the records and in part on Defendants' claims that other workers did not see the Barbers at those times and locations. *See* Tr. at 328:1-25; 426:1-12; 844:24-845:12; D. Ex. A74-78, 89. The balance of the evidence indicates that the Barbers worked these hours, as both

Magana and Erickson testified, consistent with the Barbers' own testimony, that they knew the Barbers were working on July 7, 2015, the last day before the Barbers were fired. *See* Tr. at 253:22-254:13; 821:11-822:3. The balance of the evidence also suggests that Defendants recreated or even fabricated the particular hours listed for the Barbers, as Garcia claimed that he kept these records despite his usual practices but admitted that he failed to produce these records despite numerous requests from WHD and the Secretary. *See* Tr. at 656:16-659:3.

39.     FCI uses an automated voicemail system for employees to report their work hours and locations. Tr. at 335:9-12; 422:4-9 590:17-24. At least once per week, Garcia or another person in the FCI office handling payroll listens to these voicemail messages, writes down the information, and transcribes it into an Excel spreadsheet. Tr. at 590:25-591:4; 597:8-20. The person will then compute the total hours worked, per property, for the week and input this data into QuickBooks. Tr. at 591:4-6; 594:3-12. Defendants claim that they do not retain copies of these voicemails, handwritten notes, or Excel spreadsheets after completing payroll each week. Tr. at 653:8-17.

40.     Williams' claims that he terminated FCI's working relationship with the Barbers prior to and for reasons unrelated to their complaint to WHD are pretextual.

    a.      Williams testified that Barber Sr. and Barber Jr. were a "package deal" and that the reasons for Barber Sr.'s termination applied to Barber Jr. Tr. at 1104:10-13.

    b.      Williams' testimony as to when he terminated the Barbers was inconsistent and therefore not credible. *See* Table 2 in Appendix. By comparison, the Barbers' testimony was consistent with their statements to WHI Keith and with the testimony of Magana and Erickson, and therefore is credible. *See* Tr. at 224:17-25; 253:22-254:13; 280:16-24; 300:8-25; 311:16-312:5; 328:17-329:5; 527:23-25; 528:9-10; 821:11-822:3.

c.     Williams' testimony as to when he informed others of the Barbers' termination was inconsistent with his earlier statements and the testimony of other defense witnesses and therefore is not credible. *See* Table 3 in Appendix.

d.     Williams' testimony as to why he terminated the Barbers was inconsistent with his actions and with the testimony of other defense witnesses and therefore is not credible. *See* Table 4 in Appendix.

**Back Wage Computations**

41.     WHD computed lost wages for Barber Jr. from the date of his termination until he returned to school. Tr. at 524:23-525. This period covered the partial week ending July 9, 2015 through the week ending August 27, 2015. P. Ex. 21. From the pay records that Barber Jr. provided, WHD reconstructed a weekly average of 39.43 hours worked and applied that average to Barber Jr.'s hourly rate of $11. Tr. at 526:3-527:20; P. Ex. 7, 21. WHD also computed back wages for the 20 hours that Barber Jr. reported working during the week ending July 9, 2015 that Defendants refused to pay. Tr. at 527:21-528:4; P. Ex. 21. Lastly, WHD computed back wages for the overtime premium that Defendants failed to pay Barber Jr. for the week he worked 51 hours (11 overtime hours). Tr. at 528:18-25; P. Ex. 21. The total amount of compensatory damages due to Barber Jr. is $3,530.23, plus an equal amount of liquidated damages for a total of $7,060.46. Tr. at 525:23-526:1; P. Ex. 21.

42.     WHD computed lost wages for Barber Sr. from the date of his termination through the period in which he remained unemployed and the case was unresolved. Tr. at 533:12-25. This period covered the partial week ending July 9, 2015 through the week ending December 29, 2016. P. Ex. 21. From the pay records that Barber Sr. provided, WHD reconstructed a weekly average of 45.66 hours worked during full workweeks and applied that average to Barber Sr.'s

hourly rate of $25. Tr. at 530:9-25; P. Ex. 8, 21. WHD also applied an overtime premium of $12.50 to the 5.66 overtime hours that Barber averaged. Tr. at 531:14-21; P. Ex. 21. Further, WHD computed back wages for the 20 hours that Barber Sr. reported working during the week ending July 9, 2015 that Defendants refused to pay. Tr. at 531:9-13; P. Ex. 21. WHD also computed back wages for the overtime premium that Defendants failed to pay Barber Sr. for all weeks that he worked overtime hours. *Id.* The total amount of compensatory damages due to Barber Sr. is $95,285.35, plus an equal amount of liquidated damages for a total of $190,570.70. Tr. at 534:7-16; P. Ex. 21.

43.    WHD's back wage computation methodology is reasonable and based on the records provided to WHD by the Barbers. *See* P. Ex. 7, 8, 21. Defendants do not dispute the authenticity of these records and have failed to provide any pay or time records that would alter WHD's computations. Stip. Fact 34, 35; *see also* Tr. at 496:20-25 (referencing P. Ex. 18); Tr. at 497:6-25; Stip. Fact 15, 24. The only records that Defendants provided to WHD were copies of paychecks issued to some employees and the records purporting to show the unpaid 20 hours each (minus two 30-minute deductions for lunch) that the Barbers called in for the week ending July 9, 2015. *See* Stip. Fact 24, 25; P. Ex. 17 at p. 3, ¶8; P. Ex. 18 at ¶13; D. Ex. A77, 78, 89.

44.    The Barbers made reasonable efforts to look for work after Defendants fired them. Barber Jr. testified that he would have worked for Defendants until he started school if he had not been fired. Tr. at 311:1-4. He also testified that after Defendants fired him, he looked for work but did not find another job until a month after he returned to school. Tr. at 313:4-11. Barber Sr. testified that after Defendants fired him, he looked for work by reaching out to contacts and promoting his skills on Facebook. Tr. at 362:1-9; 429:10-16. He testified that, despite his efforts, he did not find full-time work until sometime at the end of 2016. Tr. at 420:5-11.

45.     Defendants presented little to no evidence that the Barbers failed to make reasonable efforts to mitigate their damages.  Defendants implied or surmised that Barber Sr. was already working for someone else on July 8, 2015, based on Facebook posts that Barber Sr. made the same day. *See*, *e.g.*, Tr. at 426:20-429:16; D. Ex. A79-81.  But, on cross examination, Barber Sr. testified that screenshots taken from his Facebook page were posts advertising his workmanship based on work performed years earlier, and not posts of work being performed on July 8, 2015, immediately after his firing. This evidence actually supports Barber Sr.'s testimony that Defendants fired him on July 8, 2015, and immediately after, he began looking for other work.   However, Defendants did persuasively argue that the period of time Barber Sr. remained unemployed was much longer than other periods of unemployment he had previously experienced.   While Barber Sr. also persuasively testified that he experienced an unusually difficult time finding work, the court believes that a fifteen percent reduction in his back wages would be appropriate.

## CONCLUSIONS OF LAW

### Employment Relationship

1.     The FLSA defines an employee as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). The Act defines an employer as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). The FLSA "defines the verb employ expansively to mean 'to suffer or permit to work.' " *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992), quoting 29 U.S.C. § 203(g). "The Supreme Court has emphasized that the striking breadth of this latter definition stretches the meaning of employee to cover some parties who might not qualify as such under a strict application of traditional agency

law principles." *Baker v. Flint Eng'g & Const. Co.*, 137 F.3d 1436, 1440 (10th Cir. 1998), quoting *Darden*, 503 U.S. at 326 (internal quotes omitted).

2.  The Court's inquiry into the employment relationship "is not limited by any contractual terminology or by traditional common law concepts of 'employee' or 'independent contractor.' " *Henderson v. Inter–Chem Coal Co.*, 41 F.3d 567, 570 (10th Cir. 1994), citing *Dole v. Snell*, 875 F.2d 802, 804 (10th Cir. 1989). Instead, the economic realities of the relationship govern, and "the focal point is whether the individual is economically dependent on the business to which he renders service ... or is, as a matter of economic fact, in business for himself." *Id.* Thus, "an agreement between and employer and a worker designating or labeling the worker as an independent contractor is not indicative of the economic realities of the working relationship and is not relevant to the analysis of the worker's status." Administrator's Interpretation No. 2015-1, The Application of the Fair Labor Standards Act's "Suffer or Permit" Standard in the Identification of Employees Who Are Misclassified as Independent Contractors (July 15, 2015), available at https://www.dol.gov/whd/workers/Misclassification/AI-2015_1.pdf ("AI 2015-1"). *See*, *e.g.*, *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1059 (2d Cir. 1988) ("Though an employer's self-serving label of workers as independent contractors is not controlling, an employer's admission that his workers are employees covered by the FLSA is highly probative."); *Robicheaux v. Radcliff Material, Inc.*, 697 F.2d 662, 667 (5th Cir. 1983) (explaining that "[a]n employee is not permitted to waive employee status," and affirming that welders were employees despite having signed independent contractor agreements); *Olson v. Star Lift Inc.*, 709 F. Supp. 2d 1351, 1356 (S.D. Fla. 2010) (worker's receipt of Form 1099-MISC from employer does not weigh in favor of independent contractor status).

3. With regard to an "employer" within the meaning of 29 U.S.C. § 203(d), the economic reality test "includes inquiries into whether the alleged employer has the power to hire and fire employees, supervises and controls employee work schedules or conditions of employment, determines the rate and method of payment, and maintains employment records." *Baker*, 137 F.3d at 1440, citing *Watson v. Graves*, 909 F.2d 1549, 1553 (5th Cir. 1990).

4. In applying the economic reality test to "employees," within the meaning of 29 U.S.C. § 203(e)(1), courts generally consider six factors:

(1) the degree of control exerted by the alleged employer over the worker;

(2) the worker's opportunity for profit or loss;

(3) the worker's investment in the business;

(4) the permanence of the working relationship;

(5) the degree of skill required to perform the work; and

(6) the extent to which the work is an integral part of the alleged employer's business.

*Baker*, 137 F.3d at 1440, citing *Henderson*, 41 F.3d at 570. None of the factors alone is dispositive; instead, the court must employ a totality-of-the-circumstances approach. *Id.*

5. Courts have applied a three-step method to this determination. First, "[i]n deciding whether an individual is an employee or an independent contractor under the FLSA, a district court acting as the trier of fact must first make findings of historical facts surrounding the individual's work." *Baker*, 137 F.3d at 1440, citing *Henderson*, 41 F.3d at 571. Second, "drawing inferences from the findings of historical facts, the court must make factual findings with respect to the six factors set out above." *Id.* Third, "employing the findings with respect to the six factors, the court must decide, as a matter of law, whether the individual is an 'employee' under the FLSA." *Id.*

6.      In *Dole v. Snell*, the Tenth Circuit reversed a district court ruling that found that cake decorators at a bakery were independent contractors. The district court based its ruling in part on factual findings regarding the issue of control. 875 F.2d 802 (10th Cir. 1989). Specifically, the district court found that: the decorators had some flexibility to determine their work hours and to select cakes to decorate; Defendants did not oversee or supervise the actual decorating of cakes, but merely inspect the finished product and see that it meets established quality standards; and the decorators were free to offer their services to others while working for Defendants. *Id.* at 806. However, the Tenth Circuit found that the demands of the business controlled the decorators, as Defendants: required the decorators to finish all remaining orders and to work overtime as needed; rejected cakes that they deemed unsatisfactory; and approved vacations, special work schedules, and other time off. *Id.* at 807. As such, the Tenth Circuit determined that the decorators merely hired out their labor. In doing so, the decorators "were regimented with respect to the time and place, and, in essential respects, as to the quality and the manner in which they performed that labor. It is virtually impossible to look upon these individuals as having the independence which characterizes a person conducting their own business." *Id.* at 808. The Tenth Circuit also found that while the decorators were free to offer their services elsewhere, they did so to a "virtually insignificant degree." *Id.* It held: "Under these circumstances we apply the rule that it is not what the workers could have done that counts, but as a matter of economic reality what they actually do that is dispositive." *Id.*, quoting *Brock v. Mr. W. Fireworks, Inc.*, 814 F.2d 1042, 1047 (5th Cir. 1987) (internal quotations omitted).

7.      In *Dole*, the district court found that decorators, who were paid on a piece rate, determined their wages by choosing their hours and volume of work. 875 F.2d at 809. The Tenth Circuit disagreed, finding that the decorators did not share in the profits of the business or

control the factors that affected the volume of cake orders, such as retail space and decor, advertising, quality of ingredients, or the quality of others' work. *Id.* at 809-810. The decorators also did not undertake the risks associated with an independent business and therefore could not experience a business loss other than a reduction in earnings. *Id.* at 810. As such, the court found that "[t]heir earnings did not depend upon their judgment or initiative, but on [Defendants'] need for their work. *Id.*, citing *Robicheaux v. Radcliff Material, Inc.*, 697 F.2d 662, 666–67 (5th Cir. 1983).

8.      As the Tenth Circuit recognized, "Courts have generally held the fact that a worker supplies his or her own tools or equipment does not preclude a finding of employee status." *Dole*, 875 F.2d at 810. Rather, "the 'investment' [that] must be considered as a factor is the amount of large capital expenditures, such as risk capital and capital investments, not negligible items, or labor itself." *Id.* In *Dole*, the decorators supplied their own decorating equipment, while the Defendants supplied all the cake making, decorating, and packaging materials, as well as the facilities, utilities, and advertising for the business. The Court found that "[t]he relative investment of the decorators in their own tools compared with the investment of the Snells simply does not qualify as an investment in this business." *Id.*

9.      In the Tenth Circuit, "Generally speaking, independent contractors often have fixed employment periods and transfer from place to place as particular work is offered to them, whereas employees usually work for only one employer and such relationship is continuous and of indefinite duration." *Baker*, 137 F.3d at 1442, quoting *Dole*, 875 F.2d at 811 (internal quotations omitted). However, "many seasonal businesses necessarily hire only seasonal employees, and that fact alone does not convert seasonal employees into seasonal independent

contractors." *Baker*, 137 F.3d at 1442, quoting *U.S. Dept. of Labor v. Lauritzen*, 835 F.2d 1529, 1537 (7th Cir. 1987) (internal quotations omitted).

10.     The Tenth Circuit has acknowledged that while "the lack of the requirements of specialized skills is indicative of employee status, the use of special skills is not itself indicative of independent contractor status, especially if the workers do not use those skills in any independent way. *Baker*, 137 F.3d at 1443. In *Baker*, the court noted that plaintiff rig welders were highly skilled but did not exercise those skills in any independent fashion in their employment with defendant pipeline construction company. As the court stated, "Although plaintiffs are not told by Flint how to complete a particular weld, they are told by Flint foremen when and where to weld. Accordingly, the fact that plaintiffs use special skills does not necessarily indicate they are independent contractors." *Id.*

11.     The question of whether work is "integral" to a business "focuses on whether workers' services are a necessary component of the business," rather than the exclusive work of the business. *See Baker*, 137 F.3d at 1443. In *Baker*, for example, the Tenth Circuit affirmed the district court's finding that "rig welders are necessary in the construction of all [pipeline] system projects…, although they do not remain on the job site from start to finish…." *Id.* (internal quotations omitted).

12.     The Tenth Circuit specifically considered the question of the plaintiffs' economic dependence in *Baker*. There, the court held that "the dependence at issue is dependence on that job for that income to be continued and not necessarily for complete sustenance." *Baker*, 137 F.3d at 1443, quoting *Halferty v. Pulse Drug Co.*, 821 F.2d 261, 267 (5th Cir. 1987). Following this reasoning, the court found that plaintiff rig welders were economically dependent on defendant pipeline construction company, although the rig welders worked for the company

for a period of two to three months, to complete the welders' portion of the pipeline construction project. *Baker*, 137 F.3d at 1442, 1443,

13.     Here, Defendants' construction workers (including but not limited to Erickson, Barber Sr., Barber Jr., and Magana) were like the decorators in *Dole* and the rig welders in *Baker*.

    a.     <u>Control</u>: Defendants' workers "were regimented with respect to the time and place, and, in essential respects, as to the quality and the manner in which they performed that labor." *See* Findings of Fact 18, 19. Further, these individuals took outside work only to a "virtually insignificant degree." *See* Finding of Fact 13. Thus, this factor supports the conclusion that Defendants' workers were employees.

    b.     <u>Opportunity for Profit or Loss</u>: Defendants' workers did not share in the profits of Defendants' business or exercise control over factors affecting the volume of the business. *See* Finding of Fact 12. They also did not share in the risk of a business loss. *Id.* Thus, this factor supports the conclusion that Defendants' workers were employees.

    c.     <u>Relative Investment</u>: Defendants' workers invested only in their personal tools and their labor. These are not the type of "large capital expenditures, such as risk capital and capital investments," associated with ownership of one's own business. *See* Finding of Fact 15. Thus, this factor supports the conclusion that Defendants' workers were employees.

    d.     <u>Permanence</u>: Defendants had a continuous and indefinite working relationship with their construction workers, with one exception. *See* Finding of Fact 13. Because he was still in high school, Barber Jr. was only available for work during summer vacation. *Id.* This is common for working teenagers, even in businesses that are not otherwise seasonal in nature. This fact alone, however, is insufficient to convert

Barber Jr. from a seasonal employee into a seasonal independent contractor. *See Baker*, 137 F.3d at 1442. Thus, this factor supports the conclusion that Defendants' workers were employees.

e. <u>Degree of Skill</u>: Defendants hired Erickson and Barber Sr. because of their skill as licensed general contractors, but neither exercised those skills in an independent manner. *See* Findings of Fact 11, 14. Defendants chose construction projects for their properties and told Erickson and Barber Sr. when and where to work on them. *Id.* Defendants also hired other construction workers without any particular skill or experience and told them when and where to work. *Id.* These construction workers included but were not limited to Barber Jr. and Magana. *Id.* As such, this factor supports the conclusion that Defendants' construction workers were employees.

f. <u>Integral Part of Business</u>: Construction work is a necessary part of flipping houses. *See* Finding of Fact 10. While Defendants' business is not limited only to construction work, it is clear that such work is integral to the business, as it is a key component for profit. *Id.* Thus, this factor supports the conclusion that Defendants' construction workers were employees.

g. <u>Economic Dependence</u>: Erickson, Magana, and Barber Sr. each testified that they depended on their employment with Defendants for their subsistence. *See* Finding of Fact 9. While Barber Jr., as a minor, relied on his parents for subsistence, he nevertheless was dependent on his job for his income during the time he worked for Defendants. *Id.* Thus, this factor supports the conclusion that Defendants' construction workers were employees.

14.     Having considered all six factors and the economic dependence of the workers, the Court concludes that, based on the totality of the circumstances, Defendants' construction workers (including but not limited to Erickson, Barber Sr., Barber Jr., and Magana) are current or former employees of Defendants.

**Enterprise Coverage**

15.     Under the FLSA, "enterprise coverage" refers to an "enterprise engaged in commerce or in the production of goods for commerce." 29 U.S.C. § 203(s)(1). Section 203(s)(1) sets forth a two-prong test for a covered enterprise: (1) the enterprise "has employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person;" and (2) "is an enterprise whose annual gross volume of sales made or business done is not less than $500,000 (exclusive of excise taxes at the retail level that are separately stated)."

16.     As noted above, Defendants failed to argue the second prong of the test in their April 25, 2016 Motion for Summary Judgment or August 19, 2016 Reconsideration Motion. Rather, Defendants made an oral Motion to Dismiss at the start of trial on January 9, 2017 that raised this issue for the first time. As with their Reconsideration Motion, Defendants' Motion to Dismiss "only raise[s] arguments that they previously made or should have made in the original briefing of Defendants' motion for partial summary judgment," which the Court "already addressed and rejected." Reconsideration Decision at p. 3, citing *Major v. Benton*, 647 F.2d 110, 112 (10th Cir. 1981). Specifically, the Court held that:

> The retaliation provision of the FLSA in § 15(a) does not have the same "commerce" requirements of the other provision in § 15(a). *See* 29 U.S.C. § 215(a)(3). Defendants focus on the requirements of the other provision and lose sight of the fact that Plaintiff [has] only brought a claim under § 15(a)(3) for

retaliation and § 11(a) for interference with the investigation. Neither of these sections upon which Plaintiff brings its claims require Plaintiff to establish what is referred to as individual or enterprise coverage.

Decision at p. 3-4. Defendants did not present any new evidence at trial that persuaded the Court "that its prior ruling should be revisited or was clearly erroneous."

17.     Although Plaintiff urges the Court to affirm its earlier ruling on this matter, Plaintiff introduced sufficient evidence at trial to satisfy both prongs of enterprise coverage as set forth in 29 U.S.C. § 203(s)(1). First, the Court has acknowledged that "Defendants are incorrect in arguing that their workers were not handling goods or materials that have moved in interstate commerce," and the Secretary presented evidence of particular goods the workers used that had moved in interstate commerce. *See* Findings of Fact 16, 17; Decision at p. 5, citing *Donovan v. Pointon*, 717 F.2d 1320, 1322-23 (10th Cir. 1983); *Polycarpe v. E&S Landscaping Serv.*, 616 F.3d 1217, 1221 (11th Cir. 2010). Second, FCI and related business entities are a single enterprise. *See* Findings of Fact 1, 5. This enterprise is the business of flipping houses for a profit, and as such, the various entities' combined sales of real estate establish that the enterprise's annual gross volume was in excess of $500,000.[5] *See* Finding of Fact 28. While the FLSA does not define this term, its regulations state:

> The annual gross volume or sales or business done of an enterprise consists of its gross receipts from all types of sales made and business done during a 12-month period. The gross volume of sales made or business done means the gross dollar volume (not limited to income) derived from all sales and business transactions…. Gross volume is measured by the price paid by the purchaser for the property or service sold to him, as stated in the Senate Committee Report (§ 779.258). It is not measured by profit on goods sold or commissions on sales made for others. The dollar value of sales or business of the entire enterprise in all establishments is added together to determine whether the applicable dollar test is met.

---

[5] This term is commonly referred to as "annual dollar volume" or "ADV."

29 C.F.R. § 779.259.

**Retaliation**

18.     To establish a prima facie case of FLSA retaliation, Plaintiff must show that: (1) an employee engaged in activity protected by the FLSA; (2) the employee suffered an adverse action by the employer, subsequent to or contemporaneous with such activity; and (3) a causal connection existed between the employee's activity and the employer's adverse action. *Conner v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1394 (10th Cir. 1997). Although Section 15(a)(3) of the FLSA, by its terms, only protects employees who have "filed any complaint or instituted or caused to be instituted any proceeding under or related to the Act…," the 10th Circuit has read this provision broadly, "so that even the unofficial assertion of rights through complaints at work is protected." *Id.* (citing *Love v. RE/MAX of Am., Inc.*, 738 F.2d 383, 387 (10th Cir. 1984) (internal quotations omitted)).

19.     A causal connection between the employee's protected activity and the employer's adverse action "may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Conner*, 121 F.3d at 1395. In the Tenth Circuit, courts have held that "a one and one-half month period between protected activity and adverse action may, by itself, establish causation." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999), citing *Ramirez v. Oklahoma Dept. of Mental Health,* 41 F.3d 584, 596 (10th Cir. 1994) .

20.     Once the plaintiff establishes a prima facie case of retaliation, the burden then shifts to the employer to offer a legitimate reason for the employee's termination. If the employer offers such a reason, the burden shifts back to the plaintiff to show that the employer's proffered

reason is pretextual. *See Conner*, 121 F.3d at 1394, applying burden-shifting test in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

21.    However, the Tenth Circuit applies a "motivating factor" analysis to claims of retaliatory discharge under Section 15(a)(3): "When the immediate cause or motivating factor of a discharge is the employee's assertion of statutory rights, the discharge is discriminatory under § 215(a)(3) whether or not other grounds for discharge exist. If retaliation is not the motivating factor, then the discharge is not unlawful." *McKenzie v. Renberg's Inc.*, 94 F.3d 1478, 1483 (10th Cir. 1996) (internal citations and quotations omitted). This motivating factor test "is equivalent to a 'but for' inquiry—a discharge is unlawful under § 215(a)(3) only if it would not have occurred but for the retaliatory intent." *Id.* (internal citations and quotations omitted). Under this standard, "the mere existence of a non-retaliatory motive that would justify an employee's discharge does not absolve an employer of liability for a retaliatory employment decision; rather, the employer must actually rely on that nonretaliatory reason as the sufficient, motivating reason for the employment decision." *Id.* at 1484. In other words, an employer may not prevail "by offering a legitimate and sufficient reason for its decision if that reason did not motivate it at the time of the decision." *Id.*, quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 252 (1989) (plurality opinion, involving a mixed-motive situation). To that end, the plaintiff may demonstrate pretext by showing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's ... reasons for its action," which "a reasonable factfinder could rationally find ... unworthy of credence." *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997), quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997).

22.    Here, Plaintiff has established its prima facie case of retaliation by Defendants against Barber Sr. and Barber Jr. The Barbers complained about the lack of overtime pay to both

Defendants (directly to Williams and indirectly through his agent, Erickson, as foreman) and to WHD. *See* Findings of Fact 8, 34-36. This is protected activity, consistent in the plain language of the FLSA. *See Conner*, 121 F.3d at 1394. Defendants told the Barbers not to report to work within a day of their complaint to WHD and refused to rehire them within a week. *See* Findings of Fact 35, 36. The close temporal proximity between the Barbers' protected activity and their termination establishes a causal connection. *See Conner*, 121 F.3d at 1394.

23.    Defendants have not met their burden of establishing a legitimate, motivating reason for the Barbers' termination. *McKenzie*, 94 F.3d at 1483. The evidence introduced at trial makes clear that Defendants' post-hoc justifications for firing the Barbers do not comport with Williams' actions either prior to or after their termination and, as such, are pretextual. *See* Finding of Fact 39 and associated tables in Appendix; *Richmond v. ONEOK, Inc.*, 120 F.3d at 209.

**Willfulness**

24.    For an employer's actions to be willful, the employer either must have known or showed reckless disregard for the matter of whether its conduct was prohibited by the FLSA. *McLaughlin v. Richland Shoe Co.*, 485 U.S. 128, 133 (1988). There is no requirement that an employer be aware that it has violated a specific provision of the FLSA, and complete ignorance of the employer that its practices violate the Act is no defense. *Donovan v. Kaszycki & Sons Contractors, Inc.*, 599 F. Supp. 860, 870 (S.D.N.Y. Dec. 21, 1984). All that is required is that the employer knew or had reason to know that it was or might have been subject to the FLSA. *Id.*

25.    In *Solis v. SCA Restaurant Corp.*, the Court found that the Secretary met her burden of proving that Defendants willfully violated the FLSA, where the Secretary presented evidence that: 1) Defendants admitted they were aware of the minimum wage and overtime

requirements of the Act but did not change their practices even after DOL began its investigation, and 2) Defendants created false records, told employees to lie to DOL about the number of days and hours they worked, and threatened employees with termination. 938 F. Supp. 2d at 403. The Court determined that the employer's time-keeping records were false because they were self-contradictory and also contradicted the testimony of Defendants' employees, whom the Court found credible. *Id.* at 388-89.

26.     Here, the evidence established that Defendants acted willfully, in a similar manner to the defendants in *Solis v. SCA Restaurant Corp*. Williams' recorded statements from the July 15, 2015 meeting make clear that he is aware of the FLSA's standard for an employment relationship, as well as the Act's minimum wage and overtime requirements. *See* Finding of Fact 30; Table 1 in Appendix. Despite this awareness, Williams instructed his employees to lie to WHD investigators about their employment relationship or to avoid speaking with WHD investigators altogether. *Id.* These actions directly interfered with WHD's investigation and with the right of Defendants' employees to participate in the investigation without fear of reprisal. *See* Findings of Fact 30 and 32; Table 1 in Appendix. As such, Defendants acted willfully to violate Sections 11(a) and 15(a)(3) of the FLSA.

27.     Williams also instructed his employees to sign false subcontractor agreements, which misrepresented the nature of the working relationship between the employees and Defendants and were backdated to appear as if the employees signed these agreements at the time of hiring. *Id.* At least two of the agreements that Defendants provided to WHD were not signed by the purported signatories (Magana and Barber Sr.), further demonstrating Defendants' intent to mislead WHD, in violation of Section 11(a). *See* Finding of Fact 32(d), (e). Likewise, Defendants provided to WHD IRS 1099 Forms that they admit were not created, distributed to

employees, or filed with the IRS contemporaneous to their corresponding tax years. *See* Finding of Fact 32(c). During the July 15, 2015 meeting, Williams told his employees to provide him with their reported tax information, so that he could match Defendants' records to their filings. This is clear falsification of tax records and was done with the intent to conceal wrongdoing not only from WHD but also from the IRS. *Id.*

28.     Because Williams' recorded statements from the July 15, 2015 meeting demonstrate his awareness of an employment relationship under the FLSA between Defendants and their construction workers, Williams' decision to terminate the  Barbers in retaliation for exercising their rights under Section 15(a)(3) is also a willful violation of the FLSA.

**Liquidated Damages**

29.     Generally, an employer who violates the FLSA is liable for back wages and an additional equal amount as liquidated damages. 29 U.S.C. § 216(b). Liquidated damages are not a penalty exacted by the law, but rather compensation to the employee for the delay in receiving wages due, caused by the employer's violation of the FLSA. *Jordan v. U.S. Postal Serv.*, 379 F.3d 1196, 1202 (10th Cir. 2004). In its discretion, however, the Court may refuse to award some or all liquidated damages if the employer can establish that it acted both (1) in subjective good faith and (2) based on an objectively reasonable belief that its conduct was in compliance with the FLSA. 29 U.S.C. § 260; *see also Renfro v. City of Emporia, Kan.*, 948 F.2d 1529, 1540 (10th Cir. 1991), citing *Marshall v. Brunner*, 668 F.2d 748, 753 (3d Cir. 1982).

30.     Here, the willful nature of the violations establishes that Defendants acted without subjective good faith or a reasonable belief in their compliance with the FLSA. Williams' recorded statements from the July 15, 2015 meeting show that he was aware of the FLSA's requirements and acted to contravene them. *See* Finding of Fact 30; Table 1 in Appendix.

Because this Court has determined that Defendants willfully violated the FLSA, it will not reach a contrary result with regard to liquidated damages. *See Brinkman v. Dep't of Corr. of State of Kan.*, 21 F.3d 370, 373 (10th Cir. 1994).

**Permanent Injunction**

31.　　Under the FLSA, district courts have the jurisdiction to restrain violations under the Act. 29 U.S.C. § 217. Prospective injunctions are essential because the cost of non-compliance is placed on the employer, which lessens the responsibility of the Department of Labor ("DOL") in investigating instances of non-compliance. *Solis v. SCA Restaurant Corp.*, 938 F. Supp. 2d 380, 404 (E.D.N.Y. April 5, 2013), citing *Martin v. Funtime Inc.*, 963 F.2d 110, 114 (6th Cir. 1992). The imposition of an injunction is not punitive, nor does it impose a hardship on the employer, since it requires him to do what the Act requires anyway – to comply with the law. *Id.*

32.　　There are two factors that the Court should consider in whether to grant a permanent injunction: 1) the previous conduct of the employer; and 2) the dependability of his promises for future compliance. *Dunlop v. Davis*, 524 F.2d 1278 (5th Cir. 1975). While there must be some cognizable danger of recurrent violation, current compliance alone, particularly when achieved by direct scrutiny of the government, is not sufficient ground for denying injunctive relief. *Bustillos v. Bd. of County Com'rs of Hidalgo County*, 310 F.R.D. 631, 647 (D.N.M. 2015).

33.　　In *Solis v. SCA Restaurant Corp.*, the Court found Defendants willfully violated the Act by creating false records and requesting that employees lie once DOL began their investigation. 938 F. Supp. 2d at 404. The Court determined that a prospective injunction was necessary because Defendants willfully continued to violate the Act after being notified by DOL

of their non-compliance, deliberately falsified records of hours worked, and engaged in retaliatory conduct by threatening employees with termination because of their participation in the litigation. *Id.*, citing *Dunlop v. Davis*, 524 F.2d at 1281.

34.     For all the reasons set forth above, Defendants are in violation of Sections 11(a) and 15(a)(3) of the FLSA. Consistent with the Court's conclusions in paragraphs 30 to 32, above, the Court finds that Defendants have failed to come into compliance with the FLSA even while under the direct scrutiny of Plaintiff and an order from the Court. Therefore, a permanent injunction against Defendants is both necessary and in the public interest.

**Relief Granted**

35.     Plaintiff seeks back wages for Barber Jr. in the amount of $3,530.23, plus an equal amount of liquidated damages for a total of $7,060.46. Plaintiff seeks back wages for Barber Sr. in the amount of $95,285.35, plus an equal amount of liquidated damages for a total of $190,570.70. In total, Plaintiff seeks an award of $197,631.16 for the Barbers. Plaintiff also seeks a permanent injunction against Defendants and requests leave to submit a proposed injunction to the Court.  The court reduces the request for back wages with respect to Barber Sr. by fifteen percent due to the uniquely long period of time he remained unemployed, while recognizing that he faced difficulties in finding employment during that time as well.

36.     The Court orders Defendants to pay back wages and liquidated damages in the amount of $7,060.46 with respect to Barber Jr. and $161,985.10 with respect to Barber Sr., for a total amount of $169,045.56. The Court grants this request and orders Plaintiff to submit the proposed permanent injunction no later than the 18th day of May, 2017.

DATED this 8th day of May, 2017.

BY THE COURT:

_____
DALE A. KIMBALL
United States District Court Judge